UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | \| | Case No. 1:22-CR-00110-RC |
| | \| | Hon. Rudolph Contreras |
| v. | \| | |
| | \| | |
| MATTHEW THOMAS KROL, | \| | |
| | \| | |
| Defendant. | \| | |

Michael J Cronkright (P52671)  
Attorney for Matthew Thomas Krol  
4601 W. Saginaw, Ste. J2A  
Lansing, MI 48917  
Phone: (517) 719-4401  
Fax: (517) 913-6123  
Michael@Cronkrightlaw.com

Andrew Tessman  
United States Attorney's Office  
555 4th Street NW  
Washington, D.C. 20001  
Phone: (202) 256-2397  
Andrew.Tessman@usdoj.gov

## DEFENDANT MATTHEW KROL'S MOTIONS TO REVOKE DETENTION ORDER AND REOPEN DETENTION HEARING

NOW COMES, Matthew Thomas Krol, by and through his Attorney Michael J Cronkright, and moves this Honorable Court to revoke the current detention order and reopen the Detention Hearing.

### Contents

I.    INTRODUCTION ........................................................................................................ 3

II.   MATTHEW KROL'S BACKGROUND ................................................................... 3

III.  FACTUAL HISTORY & PROCEDURAL HISTORY .............................................. 9

IV.   MEMORANDUM OF LAW .................................................................................... 10

V.    ARGUMENT ........................................................................................................... 13

      A. WEIGHT OF EVIDENCE AGAINST THE DEFENDANT ............................. 13

      B. HISTORY AND CHARACTERISTICS OF THE DEFENDANT ..................... 14

      1.  The Defendant's Character ............................................................................... 15

2.    The Defendant's Mental and Physical Condition ............................................ 19

3.    The Defendant's Family Ties ......................................................................... 20

4.    The Defendant's Employment Situation ........................................................ 21

5.    The Defendant's Financial Resources ........................................................... 21

6.    The Defendant's Length of Residence in the Community and Community Ties ...................... 22

7.    The Defendant's Past Conduct ...................................................................... 22

8.    The Defendant's History, if any, Relating to Drug or Alcohol Abuse ....................... 23

9.    The Defendant's Criminal History ................................................................ 23

10.   The Defendant's Record Concerning Appearance at Court Proceedings .................. 23

   **C. DANGER TO THE COMMUNITY** ..................................................... 23

   **D. NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED** ......................... 26

CHRESTMAN GUIDEPOST 1: Whether Defendant has been charged with felony/misdemeanor offenses. ... 26

CHRESTMAN GUIDEPOST 2: The extent of the Defendant's prior planning. ......................... 27

CHRESTMAN GUIDEPOST 3: Whether Defendant used or carried a dangerous weapon. ................ 27

CHRESTMAN GUIDEPOST 4: Evidence of coordination w/ other protestors before, during, or after 1/6 ..... 28

CHRESTMAN GUIDEPOST 5: Whether Defendant played a leadership role in the events of 1/6. ........... 28

CHRESTMAN GUIDEPOST 6: The Defendant's words and movements during the riot—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, or attempted to injure, or threatened to injure others" .................. 29

**VI.     RESPONSE TO GOVERNMENT ARGUMENTS FOR PRETRIAL DETENTION** ......... 30

**VII.    PROPOSED CONDITIONS OF RELEASE** ................................................ 32

**VIII.   CONCLUSION** ............................................................................... 32

# I.     INTRODUCTION

Matthew Thomas Krol, by and through his counsel, Michael J. Cronkright, respectfully moves this Court to revoke the prior detention order. Defendant requests an evidentiary hearing to explore the facts and issues raised herein. Defendant asserts that he is neither a flight risk nor danger to the community. Further, Matthew Thomas Krol respectfully requests that he be released on personal recognizance or, in the alternative, to release him into the third-party custody of his wife and commit him to the supervision of a High Intensity Supervision Program (HISP) or consider other conditions of release as discussed *infra*.

# II.     MATTHEW KROL'S BACKGROUND

Mr. Krol is a 64-year-old natural born American citizen. He was born in Detroit, Michigan, in 1958. His parents divorced when he was 15-years-old. Family tensions led to some adolescent behavioral issues, which he had to work through. Nonetheless, Mr. Krol's history of supporting others can be traced back to this period of life as well. He dropped out of school in the 10th grade in order to financially assist his mother with household expenses. Mr. Krol secured a job in construction as a mason tender; a skill and career he has since maintained.

At 19-years-old, he decided to join the United States Marine Corps. After just three weeks of basic training, Mr. Krol began experiencing health problems, which made it difficult to continue basic training and he was then honorably discharged. Following his discharge from the U.S. Marine Corps, Mr. Krol developed a substance abuse problem. His use of drugs and alcohol led to spending 40 days in the Oakland, Michigan County Jail. Shortly after being released from jail, Mr. Krol dedicated his life to Christ. As a result, at age 22, his life changed for the better. Mr. Krol has stated that he started to grow in his faith and developed close friendships with other Christians, which is heavily evidenced in the letters of support Mr. Krol received from family and friends.

Through his friendship with fellow Christians, Mr. Krol was introduced to missionary work where he used his carpentry skills to help rebuild communities after natural disasters. This included disaster recovery work in the United States and around the world. Mr. Krol's first mission trip was a 10-day trip to Haiti, West Indies. While there, he participated in building a medical clinic in a remote village. This 10-day trip had such an impact on Mr. Krol's life that when he returned to the United States, he sold his possessions and returned to Haiti for approximately one year, working as a missionary and utilizing his carpentry skills. This trip ended after Mr. Krol became ill and needed medical treatment in the states. Mr. Krol did not let the illness that sent him home from Haiti deter his foreign missionary efforts. He became a field representative with Global Missionary Alliance. This position led to service opportunities in Haiti, Jamaica, Mexico, Guatemala, and Belize on a number of occasions.

In 1992, Hurricane Andrew hit. It was a very powerful and destructive Category 5 Atlantic hurricane that struck the Bahamas, Florida, and Louisiana. It was the most destructive hurricane to ever hit Florida in terms of structures damaged or destroyed, and remained the costliest in financial terms until Hurricane Irma surpassed it 25 years later.[1] Mr. Krol felt compelled to assist in the disaster relief efforts after Hurricane Andrew destroyed more than 63,500 homes, damaged more than 124,000 others, caused $27.3 billion in damage, and left 65 people dead.[2] He put together a small team of men with tools and generators who helped with disaster relief in any way they could. Upon his arrival in Florida, and witnessing the devastation firsthand, Mr. Krol and his wife Lisa decided to move to Florida on a short-term basis to help with re-construction efforts.

---

[1] Hurricane Andrew - Wikipedia
[2] Hurricane Andrew - Wikipedia

Mr. Krol founded an organization called Blue Skies Global Disaster. Through this organization, Mr. Krol traveled to Panama City, Florida, to participate in relief efforts after Hurricane Ivan[3].

Mr. Krol's extensive disaster relief experience resulted in him becoming certified in Community Emergency Response Teams (C.E.R.T.) and he also became a Federal Emergency Management Agency (FEMA) C.E.R.T instructor. The Community Emergency Response Team (C.E.R.T) program educates volunteers about disaster preparedness for the hazards that may impact their area and trains them in basic disaster response skills, such as fire safety, light search and rescue, team organization, and disaster medical operations.[4] Mr. Krol traveled to various cities across the United States teaching and training individuals about basic disaster response skills.

Mr. Krol became involved in the Flint Water Crisis and delivered clean, bottled drinking water to the residents of Flint. This was a public health crisis which was devastating to Flint's population and ultimately led to many of its children being subjected to lead poisoning.[5] Mr. Krol worked alongside the American Red Cross daily, taking clean water into neighborhoods in need. Garnet and Deborah Elliot have been friends with Mr. Krol for 10 years and state that "Matthew was deeply concerned for the people of the city of Flint, Michigan when the water crisis was going on. He delivered water to the people in need during that time, once again showing his love for humankind." Jerome Barry III describes Mr. Krol as being involved in "bringing large amounts of bottled water and distributing them to local citizens. Matt worked at this for many months."

---

[3] Ivan made landfall in the Gulf states in September of 2004.
[4] Community Emergency Response Team | Ready.gov
[5] https://www.britannica.com/event/Flint-water-crisis

His involvement in the Flint Water Crisis led to Mr. Krol deciding to run for Sheriff in 2016 due to his desire and passion for helping others. Having no law enforcement background, Mr. Krol did not win, but he is proud that he managed to garner 40% of the vote.

Mr. Krol eventually decided to settle in Fenton, Michigan, with his wife, Lisa Krol. Lisa and Matt have been married since 1984. Together, Mr. Krol and his wife have built a beautiful family consisting of three children and two grandchildren. One of their grandchildren lived next door with his mother (Mr. and Mrs. Krol's daughter.) Mr. Krol and his wife assisted in the care of their 4-year-old grandchild. Their grandchild misses him dearly and refers to "Papa Matt" as being his best friend. Mr. Krol's absence in his grandchild's life has been difficult as the child has no other father figure in his life. He depends on Papa Matt to take him fishing, to provide guidance, and to simply be there.

## POST JANUARY 6TH HISTORY

Mr. Krol is a well-known and respected fixture of his community. In the 12 months following January 6th, 2021, Mr. Krol did not engage in any acts of violence against any person or government entity. Mr. Krol returned to his loving family and continued his typical life—helping those around him, caring for his grandson, attending church, and living a quiet, peaceful life.

During this period of time, Mr. Krol travelled enough to be aware that he had been placed on a watch list. He was arrested 13 months after January 6th, 2021, and he was stopped several times by TSA and border patrol yet never acted in a violent or aggressive way to these government employees. In one instance Mr. Krol and various family members had attended a family wedding in Mexico. Upon their return to the United States, the entire group was detained at gunpoint, handcuffed, and interrogated. Mr. Krol was annoyed and thought this was shocking and unfair to his family. And yet, he cooperated and complied. The border patrol officers reported to the FBI

that Mr. Krol was "compliant, respectful, and courteous."[6]  This information was available to the Government at the first detention hearing but was not relayed to the Court. In the same manner, Mr. Krol was compliant with the arresting officers on February 22, 2022. Prior to his arrest, the government engaged in a significant surveillance effort with numerous officers. This included extensive stake-out activity and aerial surveillance. As a result, we have considerable knowledge of Mr. Krol's daily activities, including walking to the mailbox and putting his trash out. What is missing from this extensive surveillance is any indication that Mr. Krol had a propensity to violent or aggressive activity in the post January 6th period.

### <u>PARTIAL MEDICAL HISTORY</u>

Mr. Krol has a lengthy medical history, and it is summarized here. He came into detention with serious cardiac conditions which have worsened over time, requiring emergency intervention. Mr. Krol's diagnostic history consists of atrial fibrillation, coronary artery disease (CAD), congestive heart failure (CHF), and hypertension. In September 2021, Mr. Krol was initially diagnosed with heart failure and in October 2021, during a pre-operation workup regarding his knee, Mr. Krol was found to have atrial fibrillation (AF) and left bundle branch block (LBBB) on an echocardiogram. This discovery led to a thorough cardiologic evaluation. To manage these conditions, Mr. Krol wore a Zoll LifeVest which "is a personal defibrillator worn by a patient at risk for sudden cardiac arrest (SCA). It monitors the patient's heart continuously, and if the patient goes into a life-threatening arrhythmia, the LifeVest delivers a shock treatment to restore the patient's heart to normal rhythm**.**"[7] Mr. Krol was scheduled to have a cardiac resynchronization therapy (CRT) device on May 6th, 2022. The Zoll LifeVest readings plainly show that Mr. Krol flatlined on numerous occasions. (Exhibit A)

---

[6] Case Specific Discovery Document 266t-DE-3443278 Serial 36 page 3 of 3) (Exhibit O)
[7] LifeVest for Sudden Cardiac Arrest (clevelandclinic.org)

On March 25th, 2022, Mr. Krol was brought to UVA University Hospital East at 3:36PM as an emergency admission. An echocardiogram was preformed and was determined to be abnormal. An interpretation of the ECG states there is a sinus bradycardia and LBBB. "Sinus bradycardia is a heart rhythm where your heart beats slower than expected (under 60 beats per minute for adults) but otherwise works normally."[8] Mr. Krol was discharged on March 26th, 2022, at 2:34PM. Mr. Krol attended an appointment at the UVA Health Cardiac Electrophysiology Clinic on April 19th, 2022, accompanied by prison guards, for Atrial Fibrillation and dizziness. The doctor discussed with Mr. Krol the use of Amiodarone, which is effective in over 50% of patients in preventing recurrent AF and can help to reduce ventricular tachycardia. The doctor further referred Mr. Krol to the UVA Health heart failure team for nonischemic cardiomyopathy. Lastly, the doctor recommended that Mr. Krol pursue a cardiac resynchronization therapy (CRT) device as soon as possible to give his heart failure the soonest possibility of improvement. The following day on April 20th, 2022, at approximately 7:47PM, Mr. Krol was brought to UVA University Hospital East as an emergency admission. On April 22nd, 2022, Mr. Krol had a pacemaker implanted and was discharged the following day on April 23rd, 2022, at 3:28PM. At the time of this writing, Mr. Krol has just had an additional procedure which was necessary to explore the extent of the scar tissue in his heart.  Results are not yet available.

Mr. Krol's doctors have recommended that he participate in a sleep study for a potential sleep apnea diagnosis. His incarceration has precluded any medical investigation into this potential diagnosis. He continues to have some of the same symptoms that sent him to the emergency room. His ongoing medical issues relating to his heart are cause for great concern.

---

[8] https://my.clevelandclinic.org/health/diseases/22473-sinus-bradycardia

### III.    FACTUAL HISTORY & PROCEDURAL HISTORY

Defendant was arrested on or about February 22, 2022. The parties appeared before United States Magistrate Judge Curtis Ivy, Jr. for a pre-trial detention hearing in Michigan's Eastern District. The Government filed its motion in support of pretrial detention on February 27, 2022. *United States v. Krol*, 1:21-mj-00689-ABJ (ED. Mich. 2022). Due to time constraints, Defendant's appointed counsel did not file a response. That hearing resulted in an Order of Detention dated February 28, 2022. The detention hearing was held pursuant to 18 U.S.C. § 3142(f). The Court specifically considered the four factors enumerated in 18 U.S.C. §3142(g) and the "Chrestman Factors." *See United States v. Chrestman*, 525 F. Supp 3d 14, 23-27 (D.D.C. 2021). The magistrate judge concluded that "no conditions or combination of conditions can reasonably guarantee the safety of the community." Order of Detention @ 6. Without the benefit of a well-developed record, the Court failed to adequately consider a less restrictive condition or combination of conditions that would reasonably assure the appearance of Defendant as required and assure the safety of any other persons and the community. 18 U.S.C. §3142 (c)(1)(B).

After the detention order, Mr. Krol was transferred to his current facility, the Central Virginia Regional Jail in Orange, Virginia. Placement at this facility creates a considerable challenge to Mr. Krol's participation in the preparation of his defense. The facility does not allow inmates access to any electronic devices. While the Government has provided access to counsel for both case-specific and global discovery, there is no ability to send any of the digital media into the facility. The undersigned has visited the jail on several occasions and reviewed video from the case specific discovery. However, the benefit of that process is limited. The court is no doubt aware that there are thousands of hours of video in the possession of the government. In other January 6th cases, Defendants have the ability to review that evidence and lend reasonable assistance to counsel in the preparation of their case. Defending a criminal case is intended to be a collaboration

between the client and the attorney. Mr. Krol does not have access to the evidence and thus the defense is hampered.

## IV.   MEMORANDUM OF LAW

18 USC 3142(f) provides in pertinent part:

> The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. § 3145(b). The district court reviews a magistrate judge's detention order de novo to determine whether there are conditions of release that will reasonably assure the safety of any other person and the community. E.g., *United States v. Sheffield*, 799 F. Supp. 2d 18, 20 (D.D.C. 2011). The district court may hear additional evidence not presented at the initial detention hearing. Id.

Pursuant to the Bail Reform Act, 18 U.S.C. § 3141, a defendant must be released pending trial unless it is determined that no condition or combination of conditions exist which will reasonably assure his appearance as required or the safety of the community. 18 U.S.C. § 3142(c). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (quoting *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)).

If the rebuttable presumption under 18 U.S.C. § 3142(e)(2) does not apply, then with regard to the risk of flight analysis as a basis for detention, the government must prove by a preponderance

of the evidence that no combination of conditions will reasonably assure the defendant's presence during future court proceedings.[9] When the basis for pretrial detention is the defendant's danger to the community, the government is required to demonstrate the appropriateness of detention pursuant to subsection (e) by clear and convincing evidence. 18 U.S.C. § 3142(f). Short of that, the Court is generally required to release the defendant "subject to the least restrictive condition or combination of conditions" to achieve these goals. Id. The factors that must be considered in assessing the defendant's future dangerousness are laid out in § 3142(g) of the Bail Reform Act as: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.[10]

In United States v. Chrestman, Chief Judge Howell outlined six factors to be considered in assessing the nature and circumstances of January 6, 2021, related offenses, including whether a defendant: (1) has been charged with misdemeanors or felonies; (2) engaged in prior planning before arriving at the Capitol, for example by obtaining weapons or tactical gear; (3) carried or used a dangerous weapon, be it a firearm, large pipe, wooden club, or other offensive use instrument; (4) coordinate with participants before, during, or after the riot; (5) assumed either a formal or de facto leadership role by encouraging other rioters misconduct; (6) the nature of the defendant's words and movements during the riot.[11]

---

[9] See United States v. Xulam, 318 U.S. App. D.C. 1, 84 F.3d 441, 442 (1996) (citing United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987)) (explaining that a finding must be based on clear and convincing evidence that the defendant poses a danger to the community or a preponderance of the evidence to support the defendant's likelihood to flee).

[10] 18 U.S.C. § 3142(g); see also Munchel, 991 F.3d at 1279–80; United States v. Smith, 79 F.3d 1208, 1209 (D.C. Cir. 1996).

[11] United States v. Chrestman, No. 21-mj-218, 2021 (D.D.C. 2021).

Regarding whether a defendant presents a clearly identifiable and articulable future threat to the community the Court must consider, in light of all evidence, whether a defendant charged with felonies involving the possession of dangerous weapons at the U.S. Capitol on January 6, 2021, presents a clearly identifiable and articulable future threat to the community. Thus, a defendant's detention based on dangerousness accords with due process only to the extent that the Court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety. *United States v. Munchel*, 991 F.3d 1273 (DC Cir. 2021).

Additionally, in making an individualized assessment of dangerousness, the court must consider whether the defendant has prior felony convictions, ties to extremist organizations, and whether his post January 6th related behavior presents an articulable threat to the community, in light of evidence that a defendant did not commit illegal acts of violence or did not participate in planning / coordinating a January 6th related attack on the U.S. Capitol. *United States v. Tanios*, 856 Fed. Appx. 325 (D.C. Cir. 2021).

"To justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021) (citing § 3142(f)). The government must show that the arrestee presents "an identified and articulable threat." Id. (internal citation omitted). The assessment is not a "backward-looking assessment of the rioters or the riot" but a "forward-looking assessment" of whether the defendant will make good on the "articulable threat" in the future. Id. at 1285. In addition, after a person has been detained, "The judicial officer may, by subsequent order, permit the temporary release of the person . . . to the extent that the judicial officer determines such release

to be necessary for the preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

## V.   ARGUMENT

### A.   WEIGHT OF EVIDENCE AGAINST THE DEFENDANT

The Bail Reform Act […] instituted dangerousness as a basis for detention. *United States v. LaFontaine,* 210 F.3d 125, 134 (2d Cir.2000); *see also United States v. Dono,* 275 Fed.Appx. 35, 38 (2d Cir.2008) (unpublished opinion); ("[P]retrial detention was the means chosen by Congress in the Bail Reform Act to protect the community from dangerous defendants.") *United States v. Jimenez,* 104 F.3d 354 (2d Cir.1996). When detention is based wholly or in part on a determination of dangerousness, such finding must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B); *see also United States v. Ferranti,* 66 F.3d 540, 542 (2d Cir.1995); *United States v. Rodriguez,* 950 F.2d 85, 88 (2d Cir.1991); *United States v. Karper*, 847 F. Supp. 2d 350, 355 (N.D.N.Y. 2011). The weight-of-the-evidence factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *United States v. Marcrum*, 953 F. Supp. 2d 877, 883 (W.D. Tenn. 2013), *aff'd* (Nov. 1, 2013)(Internal citation omitted).

While the evidence against Mr. Krol is substantial, it does not compel us to conclude that he is a danger to the community going forward. The Government employs a selective view of the evidence to create their own narrative regarding Mr. Krol's alleged dangerousness, without assessing the totality of the circumstances. Unless the Government shows the defendant to be a flight risk by a preponderance of the evidence, or that he poses a continuing danger to a particularized person or community by clear and convincing evidence, and that no conditions can mitigate the alleged risks, the Act requires pretrial release. 18 U.S.C. 3141.

It is often stated that the best predictor of future behavior is past behavior. In this case, it is instructive to look at Mr. Krol's extensive history *before* and *after* the events of January 6th . As has been demonstrated herein, Mr. Krol's life has been and will be a life of non-violent and positive interactions with his community. Even his behavior on January 6, 2021, is unobjectionable to the Government, with the exception of events that substantially occurred in less than one minute[12]. It is, of course, appropriate for the Court to consider what occurred in that minute. The Government has argued and will argue that Mr. Krol had one of the most violent interactions with law enforcement officers on January 6. This is clearly an unfair assessment given the severity of other events and other defendant's behaviors. Nonetheless, there is a more compelling analysis than comparing Mr. Krol to other January 6th defendants. In fact, it is significantly more compelling to compare the 36 seconds of aggressive behavior alleged by the government to the 64 years of non-violent behavior evidenced in Mr. Krol's lifetime.

Mr. Krol was unarmed upon his arrival at the U.S. Capitol, and his behavior was  non-violent until he perceived others on the ground being struck by excessive police force. This observation led to a 36 second outburst. He did not maintain possession of the baton or use it further after the outburst.

## B.     HISTORY AND CHARACTERISTICS OF THE DEFENDANT

In considering [Krol]'s history and characteristics, the Court must "take into account the available information concerning" [Krol]'s "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning

---

[12] Subject to further review, the allegations of assault are all based on activity that occurred in approximately 36 seconds of atypical action by Mr. Krol.

appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). *United States v. Klein*, 539 F. Supp.

3d 145, 154 (D.D.C. 2021) "[T]he ten specific sub-factors reviewed immediately [below] relate to

the general history and characteristics of the particular defendant. *United States v. Chrestman*, 521

F. Supp. 3d 1107, 1116 (D. Kan.), *review granted, judgment rev'd*, 525 F. Supp. 3d 14 (D.D.C.

2021)

### 1.   The Defendant's Character

Matthew Krol is an American citizen who was born in this country and had some contact

with the criminal justice system during his youth, but quickly turned his life around when he found

God. The alleged offenses are an anomaly in Mr. Krol's otherwise law-abiding life unlike other

individuals associated with the January 6, 2021 events.

The undersigned received twelve letters from family and friends of Mr. Krol, each

describing him with astounding similarity in regard to his character. The family and friends who

wrote these letters are especially qualified to discuss his character due to the longevity of their

relationships with Mr. Krol, which ranges from 10 years to 50 years. These are peers of Mr. Krol

who know him especially well and can speak to the man he is on a day-to-day basis and can also

attest to just how out of character his actions on January 6th were. These letters detail Mr. Krol's

loyalty, selflessness, devotion to helping others, and dedication to his loved ones. Throughout these

letters we can see that the effect Mr. Krol has on those around him is positive and beneficial.

Cumulatively, the letters establish Mr. Krol's character traits of peacefulness, selflessness, and an

eagerness to help others in need.

Ralph McKay is Mr. Krol's brother-in-law. Mr. McKay states that "I always know if I am

in need of anything, Matt would be the first person I would call. He has come to my rescue if I am

in need of help on a construction project at my house or flat tire on the side of the road or flooding

in our basement. Matt is the type of person that would not only do these things for my family but also a total stranger that was in need of help." (Exhibit B)

Jerome Barry III has known Mr. Krol for close to 38 years. Mr. Barry states that Mr. Krol "is one of the rare individuals that will drop whatever he is doing to help others." He further asserted that "anyone who knows Matt knows his love of people and his willingness to help and share." (Exhibit C)

Garnet and Deborah Elliot have been friends of Mr. Krol for 10 years and gushed about Mr. Krol's character in their letter. They stated that "[n]ever once has Matthew intimidated anyone in our presence. It is obvious he values people of all races, and positions, and their rights. He employed people while he worked for us that could not find a job otherwise, training them in valuable life and work skills." They further described Mr. Krol as honest and trustworthy and went as far as to say that "[h]e is one of the kindest, and most open-hearted people we have ever known." (Exhibit D)

Mary Turner adds that Mr. Krol "is a man who has a deep passion for helping others, and always has." (Exhibit E)

## Spiritual History

Mr. Krol had a troubled beginning, starting when his parent's divorced when he was 15 years old. He dropped out of school in the 10th grade in order to help his mother with household expenses. At 19-years-old, Mr. Krol enlisted in the Marine Corps, but was honorably discharged shortly after for medical reasons. After his discharge, Mr. Krol began struggling with drugs and alcohol, which led to spending 40 days in the Oakland County Jail. After his release, Mr. Krol became a Christian and it changed his life for the better.

Reverend Timothy J. Thomas first met Mr. Krol shortly after Mr. Krol became a Christian and noted that Mr. Krol was determined to change his life. Reverend Thomas states that "God was

changing him from the inside and was making him a new, God-honoring person." Reverend Thomas considers Mr. Krol to be "very successful as a Christian and as a citizen." He further remarks that "[t]he changes in his life were instant and have continued over the years." (Exhibit F)

Denise McKay, Mr. Krol's sister-in-law, confesses that "the main thing [she has] always respected about Matt is his love for God and how he puts his family first. (Exhibit G)

Steve Adams and Mr. Krol have been friends for the better part of 20 years. He believes that the core of Mr. Krol's character is "his love of Christ and his devotion to our country. Those two things drive his every fiber to be a great father, husband, friend, and citizen. They are his foundation and everything he does transcends from there." He further contends that "Matt is a kind, generous, and thoughtful person to everyone in his life. His experiences in his life have been fraught with many challenges, however, none have kept from doing what is right in the eyes of the Lord and that of our Constitution." (Exhibit H)

## **Disaster Relief Support**

As stated, Mr. Krol has a long history of giving back to the community and aiding others in need. Mary Turner writes, "My initial thought about Matt is that he is always quick to help others. When natural disasters occurred, he was the first to volunteer for clean-up and assistance needed from Hurricane Katrina, the disaster in Oklahoma and various other states. He also did short-term volunteer mission trips to Haiti multiple times to help build homes for the orphans and those displaced after several devastating storms." (Exhibit E)

Pastor Jason McKay adds that Mr. Krol "has a heart for global missions. I know that each time we have talked about missions or missionary trips that he has been on, he has had tears in his eyes. Matt has a heart for the Lord." (Exhibit I)

Phil Cenzer, a friend of Mr. Krol for 40 years, reported that "Matt has always been a man who acts when he sees where he can be of help. He has helped many in his sphere with his skills as a carpenter and repair person. He has traveled to Haiti several times to assist hurting people with God's love and a helping hand. I traveled with him on one of these trips. Matt was the lead builder on this mission. Our team built a medical dispensary in a very remote area." (Exhibit J)

Jerome Barry III has "seen Matt drop everything many times over the last 40 years to go and provide relief in natural disaster events – from hurricanes, tornados, floods, tsunamis, etc., both in the United States and also in many relief trips to other countries. I specifically remember him doing relief work in Haiti on more than one occasion." (Exhibit C)

Mr. Krol's brother-in-law, Ralph McKay, states that he has "known Matt to have gone on mission trips around the world to help those in need with construction projects or humanitarian projects such as hurricane relief work and medical help. I personally went with Matt to Florida for Hurricane Andrew relief work in 1992. He took off work as a self-employed carpenter for over two months to help those in need in Florida. If Matt committed to saying he would help, he was always a man faithful to his word and a man of integrity." (Exhibit B)

### Flint Water Crisis

As video footage from the government supports, Mr. Krol was active in assisting in the Flint Water Crisis. He collaborated with the American Red Cross nearly daily taking clean water into neighborhoods that needed clean drinking water.

Garnet and Deborah Elliot state that "Matthew was deeply concerned for the people of the city of Flint, Michigan when the water crisis was going on. He delivered water to the people in need during that time, once again showing his love for humankind." (Exhibit D)

Jerome Barry III describes Mr. Krol as being involved in "bringing large amounts of bottled water and distributing them to local citizens. Matt worked at this for many months." (Exhibit C)

**Patriotism**

Mr. Krol is described by many who know him well as a patriot. In today's politically charged world, this characterization can have a negative connotation. Yet, in regard to Mr. Krol, it should not be construed in a negative sense. Mr. Krol is especially interested in American history and has a reverence for our founding documents. He was inspired by his uncle at an early age to be both patriotic and well-versed in history. He grew to adulthood having been taught to love his country.

Jerome Barry III confirms that "[a]nyone who knows Matt also knows his love for the USA. Matt is and always has been very patriotic. Matt is vocal about his fervent beliefs in the goodness and excellence of the United States of America and the principles and ordinances of the founding documents of the USA…Matt is and has been an ardent and active participant in promotion of our US Constitution…" (Exhibit C)

These letters demonstrate the significant impact Mr. Krol has had on the lives of those close to him, and the lives of so many others through his disaster relief work and assistance with the Flint Water Crisis.

## 2.  The Defendant's Mental and Physical Condition

As indicated above, Mr. Krol's past medical diagnostic history consists of atrial fibrillation, coronary artery disease (CAD), congestive heart failure (CHF), and hypertension. In September 2021, Mr. Krol was initially diagnosed with heart failure and in October 2021, during a pre-operation workup regarding his knee, Mr. Krol was found to have atrial fibrillation (AF) and left bundle branch block (LBBB) on an echocardiogram which resulted in a thorough cardiologic evaluation. He has no mental health issues an no history of mental health issues. His health conditions cause concerns related to his detention. The current facility he is being held at is believed generally to be a good choice due to its proximity to health care services. And yet, there

are ongoing concerns. Mr. Krol has flat lined at the facility, and, at one point, the staff was non-responsive to medical needs. It has been reported that other inmates were aware that he had collapsed on the floor and were unable to get the attention of guards or staff. The best environment for him while he works through his cardiac issues would be home with his wife and in close proximity to his adult daughter. Anyone who has gone through heart issues can appreciate the need for family support in dealing with the recovery.

### 3.   The Defendant's Family Ties

Matthew and Lisa Krol have been married for 38 years and have built a beautiful family made up of three children and two grandchildren, one of which they assisted in raising. The grandchild they assisted in raising is now four years old and proclaims that "Papa Matt" is his best friend. Family of Mr. Krol continuously state throughout their letters that he is a faithful husband, father, grandfather, and friend. In July of 2022, Mr. Krol's daughter and grandson moved to Florida, and he was unable to be there to help in the moving process or to even say goodbye. His family members have continued to support him during confinement, maintaining regular communication to the extent that it is available.

Mr. Krol's sister-in-law, Denise McKay, writes "the main thing that I have always respected about Matt is his love for God and how he puts his family first." She further asserts that she knows "Matt to be an honest, principled, God-fearing man who loves his wife more than anything in the world and is likely praying for her more than himself right now." (Exhibit G)

Ralph McKay asserts that Mr. Krol is a "man who loves God and his family above anything else. He has strong family values and continues to be a loving husband to my sister for almost 38 years. Mr. McKay further states that Mr. Krol "truly exhibits the Golden Rule of treating others as you would want to be treated. I am blessed to call him my brother and my friend and miss him greatly." (Exhibit B)

Mr. Krol's sister-in-law, Melanie McKay, writes that "Matt has always been someone I can go to if I need help with something or just to talk. ... He always wants to bless us in any way he can. Time and time again Matt has gone beyond what is needed, he is very selfless and has a heart of gold for not only us but our kids and grandchildren. Everyone loves their Uncle Matt. He loves helping people in general." (Exhibit K)

James O'Brien and Mr. Krol have been friends for over fifty years. He states that Mr. Krol has a ubiquitous devotion to family and friends that is both reliable and unwavering. He further states that neither "time nor distance impacts the shared love and respect we have for each other and our families." (Exhibit L)

Mary Turner, who has known Mr. Krol for 43 years, writes that "Matt has always been known as a loving husband and father, as well as now a loving grandfather… The three children Matt and Lisa raised are beautiful, independent, and happy adults who remain very close to their parents. Their love and respect for Matt and Lisa has always been apparent to any who spent time with them." (Exhibit E)

### 4.  The Defendant's Employment Situation

Mr. Krol has been substantially unemployed and receiving partial-disability for approximately the last 8 years. Mr. Krol does some limited contracting work for people in his community on an irregular basis. Despite his health problems, he continues to have a willingness to help people in need with his carpentry skills.

### 5.  The Defendant's Financial Resources

Mrs. Krol is employed part time as a cosmetologist usually working two 8 to 10-hour days a week earning only approximately $400 per week. Mr. Krol is awarded $900.00 per month for partial disability. This means their approximate income is currently $2,100.00 to cover their rent

and other monthly bills. Mrs. Krol has stated that she is losing sleep over the stress of not only her current financial situation, but over everything as a whole.

### 6.   The Defendant's Length of Residence in the Community and Community Ties

Mr. Krol is a fixture of his community. The undersigned received twelve letters from family and friends describing Mr. Krol as devoted to bettering, not only his own community, but others as well. He was heavily involved in the Flint Water Crisis and provided water to Flint residents.

Pastor Jason McKay is Mr. Krol's brother-in-law and has known Mr. Krol for approximately 40 years. Pastor McKay states that Mr. Krol "is your typical small-town guy that everyone knows and loves. Matt invests into his community and has lived locally in the Fenton/Linden area for about 40 years. Matt and Lisa live a humble, small-town life, making a humble small living and living in a humble small apartment but they are happy." (Exhibit I)

Kennard Van Camp was a pastor of a church that Mr. Krol and his family attended and have known each other for 42 years. Mr. Van Camp states "Matt has been a productive member of society. He is a hard worker. He is also involved with the community. As a member of our church, he took responsibility for the people who came and needed help, whether it was a job or support." (Exhibit M)

### 7.   The Defendant's Past Conduct

Mr. Krol's prior conduct will reveal a limited criminal history from his youth that Mr. Krol has not shied away from. Mr. Krol has repeatedly maintained that his life was changed after spending 40 days in the Oakland County Jail. Mr. Krol does not and has not had a propensity for violence.

### 8.   The Defendant's History, if any, Relating to Drug or Alcohol Abuse

Mr. Krol suffered with drugs and alcohol after being honorably discharged from the Marine Corps due to medical issues. Due to his use of drugs and alcohol, he spent 40 days in the Oakland County Jail. Shortly after his release, at 22-years-old, Mr. Krol dedicated his life to the Lord, and he has successfully closed that chapter of his life. His devotion to the church led to his involvement in missionary work where he was able to utilize his carpentry skills. Mr. Krol has not had any issues with drugs or alcohol since committing himself to the Lord.

### 9.   The Defendant's Criminal History

Aside from spending 40 days in the Oakland County Jail for drug and alcohol related offenses, Mr. Krol has remained a law-abiding citizen. Mr. Krol's brother-in-law, Pastor Jason McKay, states from personal knowledge that Mr. Krol "has not been in trouble with the law. It is just not in his character." (Exhibit I)

In fact, Mr. Krol has participated with law enforcement in a volunteer capacity. Jerome Barry III asserts that "Matt knows many of [the] local deputies and has maintained a positive relationship with law enforcement officers that he knows." (Exhibit C)

### 10. The Defendant's Record Concerning Appearance at Court Proceedings

It follows from the defendant's lack of significant criminal history that there is no demonstrated record of failing to appear as required for criminal cases.

### C.      DANGER TO THE COMMUNITY

"The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release." 18 U.S.C. § 3142(g). To assess a defendant's dangerousness, the court must "take into account the available

information" concerning four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4). *United States v. Klein*, 533 F. Supp. 3d 1, 8 (D.D.C. 2021)

"Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," requiring an "open-ended assessment of the 'seriousness' of the risk to public safety." *United States v. Taylor*, 289 F. Supp. 3d 55 at 70  (D.D.C. 2018). In making that assessment, the Court may consider all relevant indicia of risk to the community, including evidence that would not be admissible at trial. *Id.* Because this factor substantially overlaps with the ultimate question of whether any conditions of release "will reasonably assure ... the safety of any other person and the community," 18 U.S.C. § 3142(e), "it bears heavily on the Court's analysis." *United States v. Klein*, 539 F. Supp. 3d 145, 155 (D.D.C. 2021).

"To justify detention on the basis of dangerousness, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *Id.* § 3142(f). Thus, a defendant's detention based on dangerousness accords with due process only as far as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety. *United States v. Munchel*, 991 F.3d 1273, 1279–80 (D.C. Cir.), *judgment entered*, 844 F. App'x 373 (D.C. Cir. 2021). Further, in the absence of a concrete, prospective threat to public safety that cannot be mitigated by strict conditions, this Court should be guided by "the default rule favoring liberty." *See United States V. Cua*, No. CR 21-107 (RDM), 2021 WL 918255, at *8 (D.D.C. Mar. 10, 2021); *see also Salerno*, 481 U.S. at 755, 107

S.Ct. 2095 ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").

Mr. Krol is not a danger to the community. Mr. Krol is, in fact, a benefit to the community. His involvement in disaster relief, the Flint Water Crisis, continual volunteer work, etc. demonstrates that he has been a consistent positive impact on not only his community, but the world. His actions on January 6th, 2021, were a true anomaly and should not be construed as being a part of his character.

Mr. Krol's impact does not end with his involvement in his community, but rather extends deeply into his relationships with his family and friends. As you will read in the attached twelve letters, you will discover that Matthew Krol is an exceptional man with outstanding character and morals. He has been described as honest, trustworthy, loving, peaceful, and many other things.

Jerome Barry III wrote, "I know him [Mr. Krol] to be a peaceful person… I have never known his behavior to be aggressive or violent." (Exhibit C)

Steve Adams added that "Matt is and always will be a great man that I look up to and appreciate." (Exhibit H)

Kennard Van Camp wrote that Mr. Krol is "honest and forthcoming… I am proud to know him." (Exhibit M)

Reverend Timothy J. Thomas believes that "Matthew is a man of fine character and integrity." Reverend Thomas also refers to Mr. Krol as having a "loving disposition" and being "courageous and loyal." Further, he has "never known Matt to be violent or destructive." (Exhibit F)

Phillip and Lori Cenzer "have always known Matthew Krol as a loyal, generous and loving man." (Exhibit J)

These excerpts from the letters demonstrate that Mr. Krol is not the dangerous man the government is painting him to be. The people who know Mr. Krol can attest that he is an upstanding citizen who cares greatly for everyone in his life and anyone who is suffering.

### D.   NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED

Mr. Krol argues that he is not a danger based upon the six advisory "guideposts" articulated in *United States v. Chrestman*, No. 21-mj-218 (ZMF), 2021 WL 765662 (D.D.C. Feb 26, 2021), for assessing the comparative culpability of a given defendant in relation to others on January 6, 2021. The guideposts are as follows: (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's words and movements during the riot"—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, or attempted to injure, or threatened to injure others." Id. at 7-8.

Before discussing the Chrestman Guidepost factors, it should be noted that these factors are designed only to display a person's dangerousness based on January 6th, 2021, completely disregarding a person's character on a regular calendar day. The Chrestman factors unfairly reward the Government by requiring defendants to argue issues that should be argued at trial. Instead, defendants are forced to argue factors for pretrial release that ultimately may not weigh in their favor and that are designed to keep individuals detained irrespective of the Bail Reform Act. Defendant objects to the use of the Chrestman factors. Nonetheless, they are assessed as follows:

**CHRESTMAN GUIDEPOST 1: Whether Defendant has been charged with felony or misdemeanor offenses.**

Mr. Krol has been indicted on several felony charges. Mr. Krol has an extremely limited criminal history from his early years. This is the first time he has ever been charged with a felony or a crime of violence and he is, without question, presumed innocent of all charges even though the Chrestman guideposts reward the Government simply by charging Mr. Krol in the indictment. Of course, using this analysis, the very charges against Mr. Krol weigh against him. Nothing in the Bail Reform Act "shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. 3142(j).

This factor should not be weighed in favor of pretrial detention but should instead be eliminated as the charges against Mr. Krol should not limit his presumption of innocence. The extent to which Mr. Krol has defenses available to him is more appropriately considered at trial or in other pre-trial motions.

In context, it is respectfully submitted that this factor should not be weighed in favor of either party.

### CHRESTMAN GUIDEPOST 2: The extent of the Defendant's prior planning.

Mr. Krol was within his every right to travel to Washington, D.C. for what he believed would be a peaceful protest. Mr. Krol did in fact plan to travel to Washington, D.C. to attend a rally for former President Donald J. Trump, but in no way planned on criminal conduct. Mr. Krol has a concealed carry license and approximately ten guns. If he had planned on criminal conduct, he certainly would have planned to bring his weapons or tactical gear. Instead, he arrived in D.C. weaponless. The Government argued at the initial detention hearing (with no support) that he planned on criminal conduct before his arrival in D.C.

In context, this factor weighs in favor of pretrial release.

### CHRESTMAN GUIDEPOST 3: Whether Defendant used or carried a dangerous weapon.

For purposes of this motion, Defendant Krol will not contest that he was briefly in possession of a baton. Clearly there are trial issues related to the baton which remain unresolved. Nonetheless, the video footage appears to show that Mr. Krol handled a police baton similar to the batons that officers were using to beat protestors. A reasonable interpretation of events could include a determination that the protesters on the ground were helpless and in need of assistance. Mr. Krol is someone who is inclined to assist people who need help. Even if the perception that Mr. Krol was coming to the aid of others in need finds no support or sympathy with a jury or with this Court, those perceptions constitute the reality that explains his 36 seconds of behavior. When challenged with video during his interrogation by the FBI, he stated, "What happened 15 minutes before?" (Detention Hearing Recording @37 minutes) (Exhibit N). This question provides the context on which 36 seconds of activity should be considered, at least for the purpose of this motion.

In context, this factor should be adjudged as not favoring either party.

**CHRESTMAN GUIDEPOST 4: Evidence of coordination with other protestors before, during, or after January 6th.**

While Mr. Krol certainly was within his right to plan with two others to attend the rally together, there was no coordination before, during or even after January 6th to incite violence or participate in criminal activity.

In context, this factor weighs in favor of pretrial release.

**CHRESTMAN GUIDEPOST 5: Whether Defendant played a leadership role in the events of January 6th, 2021.**

Mr. Krol simply planned to attend a peaceful protest. Mr. Krol did not have a leadership role in the January 6, 2021, events, nor is he a member of any extremist organizations, any group that supports violence against the government, or any other hate group. Mr. Krol did not make any

statements before, during, or after January 6th which would suggest he had any leadership role in the protest nor is there any evidence to support that Mr. Krol played a leading role.

In context, this factor weighs in favor of pretrial release. Also, it should be noted that the Judge from the initial detention hearing stated on the record that Chrestman Guideposts four and five do not weigh in favor of the Government.

> **CHRESTMAN GUIDEPOST 6: The Defendant's words and movements during the riot—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, or attempted to injure, or threatened to injure others."**

Mr. Krol's cell phone location for January 6th, 2021, places him "in or immediately around the U.S. Capitol Building from 1:42 p.m. through 3:01 p.m." Statement of Facts page 19 of 20. (Exhibit O) His total time at the Capitol, then, appears to be 1 hour and 19 minutes. With the exception of the 36 seconds of controversial behavior, Mr. Krol's behavior at the Capitol is consistent with the right of citizens to present their grievances to their government in a peaceful manner. This cannot be overstated. He arrived without weapons or even symbols of violent protest. He behaved appropriately before and after the offenses charged. He did not enter the Capitol or destroy barricades. He apparently disposed of the baton in a waste receptacle before leaving the Capitol grounds. Arguably, this was to avoid the baton being used for future wrongdoing by others.

It is acknowledged that one of the officer's alleged that Mr. Krol injured him when he struck the officer with the baton. The defense has not been presented with any evidence to support that claim. This officer appears to have sustained serious injuries at the hands of others far more violent during the activities in the tunnel. Mr. Krol was not in the tunnel and the officer

made a less than affirmative statement regarding Mr. Krol in his interview.[13] (Exhibit P) It has

not been asserted that the injury required medical attention.

## VI.    RESPONSE TO GOVERNMENT ARGUMENTS FOR PRETRIAL DETENTION

A bond hearing is not a substitute for trial and is not supposed to be a pretrial opinion on

the alleged charges. Opposition arguments to pretrial release are not a dry run for the Government

to try to convict defendants or to label defendants terrorist and insurrectionist to poison the D.C.

jury pool before trial begins (Case 1:22-cr-00230-RC, Document 21, Page 2 of 23).

During the initial pretrial detention hearing, the Government was quick to label Mr. Krol

as a violent individual in an environment of escalation. And yet, it is more accurately stated that

the behavior complained of is anomaly rather than escalation. As demonstrated, Mr. Krol has an

extremely limited criminal history from his youth. Although he came to the Capitol to make his

voice be heard, as is his right, Mr. Krol's behavior which forms the basis of this prosecution was

not in furtherance of his political objectives. Right or wrong, he was responding to what he

believed was excessive use of force by the police.

The Government showed a carefully calculated selected portion of a video during the

detention hearing which only showed Mr. Krol wrestling the baton from an officer, and it was not

until the Defense played the first few seconds of the video that you could understand the entire

context surrounding Mr. Krol's actions. In the video, you can very clearly hear a bystander

repeating "cops are beating the fuck out of that guy."  From the in-depth discussion of Mr. Krol's

character as evidenced by the numerous support letters, Mr. Krol's main character trait is his

compassion for others and his quickness to run towards those who need help. Mr. Krol pushed his

way to the front of the line, despite his health issues, to defend rally attendees suffering from what

---

[13] "At approximately the thirty second mark, he can be observed striking GONELL. GONELL believes that this strike injured his hand." Case Specific Discovery Document 266T-DE-3443278 Serial 38 page 7 of 8.

appeared to be an excessive use of force by police. Whether defense of others is ultimately an issue at trial in this matter is a conversation for another day. Whether Mr. Krol accurately assessed the situation in the heat of the moment is also a conversation for another day.

The Government referenced the FBI interrogation of Mr. Krol on the date of arrest and maintained that while he did not "confess" he made several statements representative of a "confession." For example, the Government stated that when presented with video of Mr. Krol on January 6th, attempting to take the baton from the officer, Mr. Krol asked the agents "what happened 15 minutes before?" (Exhibit Q) This question evidences a layman's request that actions be taken in context. The 36 seconds are a reality to be considered. But they should be considered in the context of his 64 years of non-violence. Additionally, the 36 seconds should be considered in the context of what Mr. Krol observed immediately before.

## OCTOBER 2021 BORDER PATROL STOP

Mr. Krol was stopped by border patrol during an attempt to reenter the United States after attending his son's wedding in Bruma Valle de Guadalupe, Baja California. Mr. Krol understood that he was being stopped for reasons relating to the events on January 6th, 2021. He was upset when his entire family was asked to exit their vehicle and were then handcuffed. Mr. Krol was interrogated by the officers and expressed concern for the way other January 6th defendants were being treated in comparison to groups such as ANTIFA and BLM.

The Government has asserted that Mr. Krol's demeanor during this interrogation was abrasive; faulting him for saying that he was "pissed."  They neglected to tell the Court that the "NSU Officers thanked KROL for being courteous and cooperative throughout the time he was detained." They further stated that "[w]hile he was visibly upset about being detained and all the scrutiny he has been through recently with TSA and when traveling abroad, he was complacent and respectful toward CBP and NSU Officers."  (Case Specific Discovery Document 266t-DE-

3443278 Serial 36 page 3 of 3) (Exhibit R) This observation after a prolonged detention of his entire family tells us more about any propensity for violence than the 36 seconds at issue here.

## VII.   PROPOSED CONDITIONS OF RELEASE

If released, Mr. Krol would return to his wife in Michigan, where he has not faced criminal allegations in over 40 years. He would obey any Court orders regarding home detention, computer monitoring, regular check-ins, and avoidance of political activities or gatherings, or any other conditions of release this court deems appropriate. These conditions would eliminate any potential concerns that this Court or the government might have. Further, nothing about Mr. Krol's history suggests an unwillingness or inability to follow orders of the court or conditions of release. Mr. Krol is more than willing to surrender his passport if granted pretrial release.

## VIII.   CONCLUSION

WHEREFORE, for the foregoing reasons, and any others which may appear in our reply brief at a full hearing on this matter, and any others this Court deems just and proper, Defendant through counsel, respectfully requests that he be released on personal recognizance. If that request is denied, Defendant requests as an alternative, that he be released on Third Party Custody and placed into Highly Intensive Supervision Program of the Pretrial Services Agency conditioned on reasonable conditions including but not limited to electronic monitoring, work release, and curfew.


Respectfully submitted:

_____
Michael J Cronkright (P52671)
Cronkright Law, PLLC
4601 W. Saginaw, Ste. J2A
Lansing, MI 48917
Phone (517) 881-4643
Michael@Cronkrightlaw.com