**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.:  22-110 (RC) |
| | : | |
| MATTHEW THOMAS KROL, | : | Re Document Nos.:   24, 25 |
| | : | |
| Defendant. | : | |

<u>**MEMORANDUM OPINION**</u>

**DENYING DEFENDANT'S MOTIONS TO REVOKE DETENTION ORDER AND REOPEN DETENTION HEARING**

## I.   INTRODUCTION

Defendant Matthew Thomas Krol was one of the hundreds of people who stormed the Capitol to stop Congress from certifying the results of the 2020 presidential election.  On January 6, 2021, Krol allegedly pushed through to the front of the crowd fighting with law enforcement officers near the steps of the Capitol, wrested a police baton away from a Metropolitan Police Department officer, then assaulted at least two other police officers.  Krol was arrested on February 22, 2022.  Following a detention hearing before Magistrate Judge Curtis Ivy, Jr. of the U.S. District Court for the Eastern District of Michigan, Krol was ordered detained pending trial and transferred to his current facility, the Central Virginia Regional Jail in Orange, Virginia.  Krol now asks the Court to revoke that detention order and reopen the detention hearing.  For the reasons described below, the Court will deny the motions.

## II. BACKGROUND[1]

On January 6, 2021, Krol participated in the riot at the U.S. Capitol, assaulting at least three law enforcement officers.  Mot. Supp. Pretrial Det. at 1, 8, 24, ECF No. 26-1.  Multiple videos from January 6 show that, while on the Capitol grounds, Krol wore blue jeans, a dark jacket, and a light red hood pulled over a baseball cap; he also carried a green backpack that had a large blue flag draped across the front and a small American flag affixed to the backpack behind Krol's right shoulder.  *Id.* at 9; Gov't Ex. 3 at 00:01.[2]

As rioters began fighting with law enforcement officers attempting to maintain the police line near the steps of the Capitol building, Krol pushed toward the front of the crowd.  *See* Gov't Ex. 1 at 00:00–00:33.  Although Krol threw a water bottle toward the officers as he made his way through the crowd, the bottle appeared to instead hit another rioter.  *Id.* at 00:26–00:27. Upon arriving at the front of the crowd, Krol grabbed Metropolitan Police Department ("MPD") Officer D.P. and swung Officer D.P. around as they struggled over Officer D.P.'s police baton. *Id.* at 00:36–00:45.  After wresting Officer D.P.'s baton away from him, Krol held the baton up towards the crowd.  *Id.* at 00:46.  Krol then turned around and struck another officer, MPD Officer J.M., using that baton.  Mot. Supp. Pretrial Det. at 11.  In addition, U.S. Capitol Police Sergeant A.G. subsequently identified an individual, later identified as Krol, as having struck Sergeant A.G. with a baton, injuring Sergeant A.G.'s hand.  *Id.* at 19.

A tipster who knew Krol personally subsequently identified Krol to the Federal Bureau of Investigation ("FBI") based on the FBI's Most Wanted images from January 6.  *Id*. at 5–6.

---

[1] This background is drawn from the Government's charging instruments, the parties' briefing, and the exhibits tendered to the Court in support of each party's filings.  It does not represent the Court's findings of fact on the merits of the case.

[2] Exhibits labeled "Gov't Ex. ___" are located in an electronic folder that the Government shared with the Court.

According to public sources, Krol has served in a leadership position with the Genesee County Volunteer Militia. *Id.* at 20. During an interview with U.S. Customs and Border Protection ("CBP") in October 2021, when asked if he was an activist in Michigan, Krol "admitted he attends rallies, and having strapped an AR on his shoulder to go guard the recruiting offices in Chattanooga, TN." Def.'s Mots. to Revoke Det. Order and Reopen Det. Hr'g ("Def.'s Mots.") Ex. R at 2, ECF No. 24.[3] Krol further stated during the CBP interview that "there is a lying fucking thief in the Office, and he needs to go," and "the bitch in Michigan, the governor, she needs to be arrested." *Id.*

On February 22, 2022, Krol was arrested. Mot. Supp. Pretrial Det. at 24. During an interview with the FBI, Krol stated that, on January 6, he had walked—including walking "over a . . . wall"—from former President Trump's speech to the Capitol. *Id.*; Def.'s Mots. Ex. Q (FBI Interview, Part 2) at 27:55–27:59. Krol also admitted during the interview that he had associated with individuals charged in the alleged plot to kidnap the Governor of Michigan, Gretchen Whitmer. Mot. Supp. Pretrial Det. at 24. Krol has been charged with: (1) civil disorder, in violation of 18 U.S.C. § 231(a)(3); (2) assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1); (3) assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); (4) robbery, in violation of 18 U.S.C. § 2111; (5) entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); (6) engaging in physical violence in a restricted building or grounds with a dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); and (7) act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). *See* Indictment, ECF No. 11.

---

[3] Exhibits labeled "Def.'s Mots. Ex. __" were provided to the Court on a USB flash drive.

After Krol's arrest, the Government moved for his detention.  On February 28, 2022, Magistrate Judge Curtis Ivy, Jr. of the U.S. District Court for the Eastern District of Michigan conducted a detention hearing.  *See* U.S. Mem. Opp'n at 2, ECF No. 26.  Magistrate Judge Ivy ordered Krol detained, concluding that the information submitted at the detention hearing established by clear and convincing evidence that Krol was a danger to the community.  Order Granting Mot. Pretrial Det. at 1, ECF No. 26-2.  Krol was then transferred to his current facility, the Central Virginia Regional Jail in Orange, Virginia.  Def.'s Mots. at 9.  Krol now moves to revoke the detention order and reopen the detention hearing.  *See generally id.*  The Government opposes his release.  *See* U.S. Mem. Opp'n.  The Court held a hearing on the matter.  *See* Min. Entry (Oct. 6, 2022).

Following the hearing, the Government submitted a supplemental response containing the transcripts of social media chats between Krol and individuals convicted of or on trial for being involved in the alleged plot to kidnap Governor Whitmer.  U.S. Suppl. Resp. at 1–2, ECF No. 27.  In one chat, Krol wrote that he "spoke on the Michigan Capital [*sic*] steps last fall that I would rather apprehend Tyrants at the Capital [*sic*], hang them on those beautiful oak trees then kill citizens in a civil war."  U.S. Suppl. Resp. Ex. 1 at 2, ECF No. 27-1.  Krol also filed a supplement attaching incident reports from the Central Virginia Regional Jail describing an event where Krol was found lying face down in his cell.  Def.'s Suppl. Def.'s Mots. at 1, ECF No. 29.

Krol's motions are ripe for decision.  For the reasons explained below, the Court denies Krol's motions to revoke the detention order and reopen the detention hearing.

### III. LEGAL STANDARD

#### A. Pretrial Detention Under the Bail Reform Act

Where a person has been ordered detained by a magistrate judge pending trial, "the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The D.C. Circuit has "not squarely decided" what the standard of review should be for such proceedings. *See United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021). But, as of 2021, every circuit to address the issue had held that a district court's review of a magistrate's detention order is *de novo*. *See United States v. Chrestman*, 525 F. Supp. 3d 14, 23 & n.5 (D.D.C. 2021) (collecting cases). Neither party argues otherwise. Accordingly, the Court will review the detention order *de novo*.

The Bail Reform Act permits the detention of a defendant awaiting trial only in "carefully defined circumstances." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). First, a defendant qualifies for pretrial detention if his case "involves" (1) an offense that falls into one of five enumerated categories that include "a crime of violence," 18 U.S.C. § 3142(f)(1), or (2) a serious risk that the defendant will flee, obstruct (or attempt to obstruct) justice, or threaten, injure, or intimidate a witness or juror (or attempt to do so), *id.* § 3142(f)(2)(A)–(B). Second, where the Bail Reform Act authorizes pretrial detention, the court "shall order the detention" of a qualifying defendant if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(e)(1). In other words, "the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). Moreover, a finding that no condition or combination of conditions will

reasonably assure the safety of any other person and the community must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f)(2).

## B.  Reopening a Detention Hearing

The Bail Reform Act further provides that a detention hearing

> may be reopened . . . at any time before trial if the judicial officer finds that
> information exists that was not known to the movant at the time of the hearing
> and that has a material bearing on the issue whether there are conditions of release
> that will reasonably assure the appearance of such person as required and the
> safety of any other person and the community.

18 U.S.C. § 3142(f)(2).  Although the statute does not define "material bearing," it has been

defined to "refer to information that actually affects the Court's decision whether to detain the

defendant pending trial."  *United States v. Chansley*, No. 21-cr-3, 2021 WL 2809436, at *3

(D.D.C. July 6, 2021).  "Thus, in addition to 'bearing' on—having a logical relation to—

detention, the sort of new information capable of reopening a detention hearing must also 'bear'

*materially*—it must relate in some *significant* or *essential* way to the decision whether to detain."

*United States v. Worrell*, No. 21-cr-292, 2021 WL 2366934 at *9 (D.D.C. June 9, 2021).  In

addition, "[n]ew and material information . . . consists of something other than a defendant's

own evaluation of his character or the strength of the case against him; instead, it must consist of

truly changed circumstances, something unexpected, or a significant event."  *United States v.*

*Caldwell*, No. 21-cr-181, 2022 WL 168343, at *6 (D.D.C. Jan. 19, 2022) (quoting *United States*

*v. Lee*, 451 F. Supp. 3d 1, 5 (D.D.C. 2020)).

## IV.  ANALYSIS

Based on the evidence currently available to the Court, the Court will deny Krol's

motions to revoke the detention order and reopen the detention hearing.  Krol's violent rhetoric,

association with individuals alleged to have been involved with the plot to kidnap Governor

Whitmer, historical leadership of a militia group, and ownership of approximately ten guns lead the Court to conclude that Krol poses a concrete, prospective threat to public safety.  Defense counsel avers that Krol suffers from serious cardiac conditions that predated his arrest but that have worsened during his detention.  During the hearing on Krol's motions on October 6, the Court urged defense counsel to provide Krol's medical records for the Court's consideration. Rather than submitting medical records documenting a formal diagnosis of Krol's purported cardiac conditions, however, Krol has thus far only submitted to the Court readings from his personal defibrillator and certain Central Virginia Regional Jail incident reports describing an event where Krol was found lying face down in his cell.  These documents do not clearly establish that Krol suffers from the cardiac conditions described in his motions.

Without more concrete evidence of Krol's medical conditions as diagnosed by a doctor, the Court does not find sufficient support for Krol's request that he be released.  Further, without the purported developments in Krol's medical conditions, Krol offers only letters of support and claims about his disaster relief efforts and work to provide Flint, Michigan residents with bottled water.  This information does not constitute new and material information sufficient to merit reopening the detention hearing.  Krol also contends that detention in his current facility, which does not allow inmates access to electronics, prevents him from reviewing video evidence and participating fully in his defense.  But because Krol does not aver that his defense counsel is unable to bring electronics to the facility to show him the evidence, and the Court has requested that the Government investigate further to see if the jail can accommodate Krol's access to relevant evidence, the Court does not now conclude that it would be necessary to release Krol for this reason or that transfer to a different facility would be the more appropriate remedy. Accordingly, the Court will deny Krol's motion to revoke the detention order and deny the

motion to reopen the detention hearing.  Should Krol submit to the Court medical records evincing a formal diagnosis of his purported medical conditions, Krol may refile his motion to reopen the detention hearing for the Court's consideration.

### A.  Revocation of Detention Order

Krol qualifies for pretrial detention under the Bail Reform Act.  As previously noted, a case that involves a crime of violence—which includes "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," 18 U.S.C. § 3156(a)(4)(A)—will qualify a defendant for pretrial detention, 18 U.S.C. § 3142(f)(1)(A).  Among other offenses, Krol has been charged with assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).  *See* Indictment.  Because that offense is "categorically a crime of violence," Krol is eligible for pretrial detention.  *See United States v. Quaglin*, 851 F. App'x 218, 218 (D.C. Cir. 2021); *see also United States v. Klein*, 533 F. Supp. 3d 1, 8–9 (D.D.C. 2021).

Thus, the Court turns to whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  The Government focuses on arguing that Krol poses a danger to the community.  *See, e.g.*, U.S. Mem. Opp'n at 4; Mot. Supp. Pretrial Det. at 1.  The question for this Court, then, is whether Krol should be detained based on dangerousness.  "To justify detention on the basis of dangerousness, the Government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'"  *Munchel*, 991 F.3d at 1279–80 (quoting 18 U.S.C. § 3142(f)).  "Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics,

and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *Id.* at 1280. The "dangerousness inquiry" is a "forward-looking determination." *United States v. Languerand*, No. 21-cr-353, 2021 WL 3674731, at *4 (D.D.C. Aug. 19, 2021) (quoting *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021)).

Assessing whether the Government has made this showing requires consideration of four factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). The Court will address each in turn.

### a. Nature and Circumstances of Krol's Charged Offenses

Chief Judge Howell's six considerations for assessing the relative severity of a Capitol rioter's conduct provide a helpful framework for the Court's analysis of this first factor. *See Chrestman*, 525 F. Supp. 3d at 26–27. Those considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses," (2) "engaged in prior planning before arriving at the Capitol," (3) carried or used a dangerous weapon during the riot, (4) "coordinat[ed] with other participants before, during, or after the riot," or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct," and (6) the nature of the "defendant's words and movements during the riot," including whether he "threatened or confronted federal officials or law enforcement." *Id.*

Four of the six *Chrestman* factors illustrate Krol's higher "comparative culpability . . . in relation to fellow rioters." *Id.* at 26. First, the first and third *Chrestman* factors are related here. The Government argues that Krol has been "charged with a felony and crime of violence," and "using a dangerous weapon against law enforcement is an extremely serious offense." Mot.

Supp. Pretrial Det. at 29–30.  Krol concedes that he has been indicted on felony charges but

submits that the first *Chrestman* factor should not weigh in favor of either party and the

Government should not be "reward[ed]" simply for charging him with felonies.  Def.'s Mots. at

27.  Additionally, in relation to the third *Chrestman* factor, Krol does not contest that he "was

briefly in possession of" and "handled" a baton, but puts forward that one might determine that

Krol was or believed he was "coming to the aid" of other rioters.  *Id.* at 28.

     As Krol states correctly, "[n]othing in the Bail Reform Act 'shall be construed as

modifying or limiting the presumption of innocence.'"  *Id.* at 27 (quoting 18 U.S.C. § 3142(j)).

Contrary to Krol's arguments otherwise, however, the Court is not making any findings here as

to his guilt or innocence of the charges laid against him.  In considering the level of the charges

against Krol, the Court is merely using the information "evident on the face of a criminal

complaint, information, or indictment" to "inform [its] assessment" of the nature and

circumstances of the offense charged, as mandated by the Bail Reform Act.  *Chrestman*, 525 F.

Supp. 3d at 26.

> The overarching goal of the § 3142(g) analysis—to ensure that the pretrial release
> of a defendant will not imperil "the safety of any other person and the
> community"—and § 3142(g)(1)'s mandate that judges consider certain offense
> characteristics that might be probative of danger to the community suggest that a
> reviewing court should give weight to any particulars of the offense that indicate
> the defendant continues to pose a threat to public safety.

*Id*. (citation omitted).  "Felony charges are by definition more serious than misdemeanor

charges," and the "dangerousness inherent in a defendant's conduct on January 6" is

relevant to the Court's assessment of whether a defendant would remain a danger to the

community should he be released.  *Id.*  Thus, the first *Chrestman* factor weighs in favor

of detention.

10

So too does the third *Chrestman* factor weigh in favor of detention.  Like the defendant in *United States v. Sabol*, 534 F. Supp. 3d 58 (D.D.C. 2021), Krol is alleged to have "[taken] the [baton] from a vulnerable MPD officer and subsequently wielded it" against others.  *Id.* at 74.  Video footage shows the individual identified as Krol striking at least one other officer with that same baton, Mot. Supp. Pretrial Det. at 11, and it is alleged that Krol struck another officer with either a short pole or baton, *id.* at 19.  As in *Sabol*, Krol's alleged "willingness to strip a vulnerable law enforcement officer of his weapon" and his use of it in assaulting others "speak[]" to the gravity of the offenses with which he has been charged as well as the danger he poses not just to his community, but to the American public as a whole."  534 F. Supp. 3d at 74.[4]

The fifth and sixth *Chrestman* factors weigh further in favor of detention.  The D.C. Circuit has stated that "those who actually assaulted police officers and broke through windows, doors, and barricades . . . are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."  *Munchel*, 991 F.3d at 1284.  Krol states that he did not enter the Capitol or destroy barricades.  Def.'s Mots. at 29.  But as previously discussed, video footage shows the individual identified as Krol pushing through to the front of the crowd just as rioters began fighting with police officers guarding the Capitol.  Gov't Ex. 1 at 00:13–00:33.  He was among the first wave of rioters who contributed to breaking through the police line, and he pushed Officer D.P. back from the line as he swung Officer D.P. around for the baton.  *Id.* at 00:36–00:38.  After stealing the baton, he then held it up towards the crowd of rioters, as though in victory.  *Id.* at 00:46.  By allegedly helping to break the police line

---

[4] The Court addresses Krol's arguments about coming to the aid of other rioters below in relation to the sixth *Chrestman* factor.

and holding the baton up to the crowd as if to celebrate, Krol encouraged other rioters to follow—if not necessarily to assault the officers, then at least to advance forward on the Capitol.

Krol attempts to diminish the potential seriousness of his alleged actions by casting doubt on whether he may have injured Sergeant A.G., stating in part that Sergeant A.G. suffered "serious injuries at the hands of others far more violent" and that Sergeant A.G. "made a less than affirmative statement regarding Mr. Krol in his interview." Def.'s Mots. at 29–30. Krol also contends that the government has shown a mere "36 seconds of controversial behavior" during the totality of the time Krol spent at the Capitol on January 6. *Id.* at 29. That other rioters may have done worse to Sergeant A.G. that day, however, does not absolve Krol of his alleged actions. *See United States v. Brockhoff*, 590 F. Supp. 3d 295, 304 (D.D.C. 2022) ("That the means may have been less violent than, for example, bashing an officer with a flagpole, is immaterial. [Defendant's] actions were deliberate, and deliberately aimed at breaking police resistance. These actions show a blatant disrespect for the role of law enforcement and their efforts to maintain the safety of the Capitol and the lawmakers inside."). Nor does the short duration of Krol's alleged conduct vindicate him; what matters is the havoc that the Government contends Krol wreaked in that time by assaulting officers and potentially encouraging others to do the same.

Further, Krol argues that the Court might interpret his actions in a more charitable light— that, as "someone who is inclined to assist people who need help," Krol may have been "coming to the aid" of rioters who "were helpless and in need of assistance." Def.'s Mots. at 28, 30–31; *see also id.* at 30 ("Right or wrong, he was responding to what he believed was excessive use of force by the police."). The Court declines to weigh in at this stage on whether Krol may ultimately claim that he was acting in defense of others on January 6. For its purposes here, the

12

Court need only observe that it appears that Krol took "'offensive action' directed toward law enforcement officers . . . ; his actions were deliberate and dangerous; and any attempts to render aid to another rioter . . . do not negate the dangerousness he poses to the community in view of the conduct he displayed on that day." *United States v. McAbee*, No. CR 21-35-7, 2021 WL 6049909, at *11 (D.D.C. Dec. 21, 2021). Krol has not presented any statement of his state of mind at the time; he has not claimed that Officer D.P. was applying excessive force against anyone, that the officers he allegedly attacked with the baton were applying excessive force against anyone, that he did anything in aid of the protester reflected in the video who was being forcefully subdued by officers, or that the officers were not acting reasonably in arresting a protester who penetrated deep behind the police line.

The two remaining factors—the second and fourth *Chrestman* factors—do not weigh against Krol. With respect to the second factor, the Government in the detention hearing before Magistrate Judge Ivy referred to Krol planning to "travel with the people he went with," Audio R. Det. Hr'g at 33:07–33:09, and Krol alludes in his motions to "his right to plan with two others to attend the rally together," Def.'s Mots. at 28. Krol contends that this second factor should not be held against him since he "arrived in D.C. weaponless." *Id.* at 27. Although courts have, in relation to this factor, taken into consideration a defendant's coordination of his trip with associates, *see, e.g.*, *McAbee*, 2021 WL 6049909, at *9, the briefing provides little more than passing reference to Krol traveling with others and does not otherwise indicate that Krol engaged in any planning beyond this travel. Relatedly, aside from Krol's travel with others before the riot, the record does not show that, per the fourth *Chrestman* factor, Krol coordinated with other participants during or after the riot. Based on the video evidence submitted, Krol appears to have been moving in the crowd and acting on his own at the Capitol. While Krol's actions may have

encouraged other rioters that day, he does not appear from the footage to have been *coordinating* with anyone.  Accordingly, the second and fourth *Chrestman* factors do not weigh against Krol.

On balance, four of the six *Chrestman* factors demonstrate the severity of Krol's conduct on January 6 and "evince a clear disregard for the law" as well as "deliberate efforts to undermine law enforcement," which together "indicate that he poses a danger to the community."  *Chrestman*, 525 F. Supp. 3d at 28.  The nature and circumstances of Krol's charged offenses therefore weigh heavily in favor of detention.

**b.  The Weight of the Evidence Against Krol**

The weight of the evidence against Krol tends to favor detention.  During his interview with the FBI, Krol denied multiple times that he was the individual in the video footage shown to him.  *See, e.g.*, Def.'s Mots. Ex. Q (FBI Interview, Part 1) at 08:08, 37:50.  But Krol admitted to being present on the Capitol grounds on January 6.  *See* Def.'s Mots. Ex. Q (FBI Interview, Part 2) at 27:36.  Phone records for Krol's phone number show that he was in or around the Capitol between 1:42 p.m. and 3:01 p.m. on January 6, which aligns with the time when Krol allegedly assaulted Officers D.P. and J.M.  Mot. Supp. Pretrial Det. at 23; Compl. at 19.  The Government has submitted several videos from different angles, including close-ups from body camera footage, capturing the actions, face, and attire of the person later identified as Krol.  *See, e.g.*, Gov't Ex. 1 at 00:00–00:33; Gov't Ex. 3 at 00:00; Gov't Ex. 4 at 00:02.  And notably, a tipster who knew Krol personally identified him based on the FBI's Most Wanted images from January 6.  Mot. Supp. Pretrial Det. at 6.  This tipster then provided a photograph of an individual, whom this tipster identified as Krol, attending a protest at the Michigan Capitol Building while wearing a small American flag affixed behind his right shoulder.  *Id.*  Taken together, these pieces of evidence against Krol move this factor toward detention.

### B.  Krol's Personal History and Characteristics

Although certain aspects of Krol's personal history and characteristics weigh against detention, others—described in Section IV.A.d. below—reinforce that he would pose a danger to his community should he be released.  In evaluating a defendant's personal history and characteristics, a court considers the defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."  18 U.S.C. § 3142(g)(3)(A).

The Court recognizes that Krol has certain commendable qualities.  Family members and friends wrote to the Court in support of his release and described his community ties, attesting consistently to Krol's devotion to his family and his willingness to help others in need.  *See* Def.'s Mots. Exs. B–M.  Krol has been married to his wife since 1984 and is the father of three children and grandfather of two grandchildren.  Def.'s Mots. at 6.  Krol states that he has participated in disaster relief efforts and delivered bottled water to residents of Flint, Michigan.[5] *Id.* at 4–6.  Although Krol acknowledges that he at one point "struggle[d] with drugs and alcohol, which led to spending 40 days in the Oakland County Jail" many years ago, *id.* at 16, the Government states that Krol "has no criminal history," Mot. Supp. Pretrial Det. at 25.[6]

---

[5] Krol does not mention, however, that he may have delivered the water to Flint residents in connection with his participation in the Genesee County Volunteer Militia.  *See* U.S. Mem. Opp'n at 20–21.

[6] The Court notes that, during the pretrial detention hearing before Magistrate Judge Ivy, the Government indicated that it was seeking additional information about an "incident" dating from 2014 at the Michigan State Capitol in Lansing, Michigan.  Audio R. Det. Hr'g at 26:19–27:07.  The Government represented that there existed a record describing Krol as having been arrested and having had a gun taken from (and later returned to) him, though this incident did not appear in Krol's criminal history.  *Id.*  But the Court has not received any updates as to what, if anything, of note resulted from the Government's efforts.  Accordingly, the Court continues to rely on the Government's statement that Krol has no criminal history.

Of most concern to the Court here, Krol avers that he suffers from serious, potentially life-threatening cardiac conditions.  Def.'s Mots. at 7–8.  According to Krol, his "diagnostic history consists of atrial fibrillation, coronary artery disease (CAD), congestive health failure (CHF), and hypertension."  *Id.* at 7.  After Krol was "diagnosed with heart failure" in September 2021 and "found to have atrial fibrillation (AF) and left bundle branch block (LBBB) on an echocardiogram" in October 2021, Krol wore a personal defibrillator that showed "that Mr. Krol flatlined on numerous occasions."  *Id.*  As an exhibit to his motions, Krol includes readings from this defibrillator.  Def.'s Mots. Ex. A.  Krol further recounts two instances in which he was admitted to the University of Virginia ("UVA") University Hospital, the second of which resulted in Krol having a pacemaker implanted.  Def.'s Mots. at 8.

During the hearing on Krol's motions on October 6, the Court urged defense counsel to provide Krol's medical records for the Court's consideration.  Rather than submitting medical records documenting a formal diagnosis of Krol's purported cardiac conditions, however, Krol instead supplemented his motions with certain Central Virginia Regional Jail incident reports describing an event on April 20, 2022, where Krol was found lying face down in his cell.  Def.'s Suppl. Def.'s Mots. at 1.  These reports detail how Krol explained that he fell after "his Life Vest alarm was going off," Def.'s Suppl. Def.'s Mots. Ex. A at 1, ECF No. 29-1, and that Krol saw "light flashes prior to his LifeVest defibrillator alarm going off," Def.'s Suppl. Def.'s Mots. Ex. D at 2, ECF No. 29-4.

The documentation that Krol has provided does not contain proof that Krol has received a formal diagnosis of the cardiac conditions that he lists in his motions, that these conditions pose a threat to Krol's life, or that he cannot receive adequate treatment if detained.  Somewhat to the contrary, the documentation indicates that his vital signs after the incident on April 20, 2022

appeared to be normal.  *See* Def.'s Mots. Ex. D at 1–2 (incident report from licensed practical nurse stating that "[f]ollowing incident [Krol] was transported via wheelchair to Booking where vital signs were obtained and were within normal limits").  And in stark contrast to his claims of these potentially debilitating conditions, Krol admitted to the FBI that he walked from former President Trump's speech, including walking "over a . . . wall," to get to the Capitol.  Def.'s Mots. Ex. Q (FBI Interview, Part 2) at 27:55.  The video footage purportedly of Krol also shows an individual still capable of vigorous, aggressive action that might cause injury to others.[7] Further, as the Court stated on October 6, it appears that UVA has provided Krol with good medical care while he has been incarcerated.

Given Krol's claims of an extensive medical history, it is puzzling to the Court why Krol has not been willing or able to submit actual medical records in support of his motions.  In fact, the recording of his detention hearing before Magistrate Judge Ivy suggests that Krol's previous counsel submitted certain documents about Krol's medical history to Magistrate Judge Ivy. Audio R. Det. Hr'g at 28:10–28:33.  The Court does not have access to those documents furnished to Magistrate Judge Ivy, and Krol's current counsel has not provided those documents here.  Without more, Krol has not provided sufficient, concrete support for his claim that he should be released for this medical need.[8]  Should Krol submit to the Court medical records

---

[7] Indeed, when presented with footage during his FBI interview, Krol exclaimed, "Amazing how much gump that guy has for all the ailments I have."  Def.'s Mots. Ex. Q (FBI Interview, Part 1) at 14:58–15:02.  The Court presumes that Krol meant to suggest that the individual in the footage had gumption or energy, as opposed to calling the individual a "gump," as the term "gump" is typically defined as a "foolish person, a dolt."  *Gump*, Oxford English Dictionary (Mar. 2022 ed.).

[8] In a footnote to its Opposition, the Government has conceded that a serious medical condition that cannot be adequately treated in custody may provide a basis for home detention with strict restrictions.  U.S. Mem. Opp'n at 2 n. 1.

evincing a formal diagnosis of his purported medical conditions, however, Krol may refile his motion to reopen the detention hearing for the Court's consideration.

### D. The Nature and Seriousness of the Danger Krol's Release Poses

Weighing strongest against release are the Court's serious reservations about Krol's statements evoking the use of violence to achieve his political aims, association with individuals charged in the alleged plot to kidnap Governor Whitmer, historical leadership of a militia group, and ownership of a cache of guns.

The Government has submitted in support of its opposition several of Krol's Facebook messages and posts, in which Krol evoked the use of violence against politicians and open hostility toward Governor Whitmer, in addition to sharing pictures of himself carrying weaponry. In one message chain from June 2020, an individual identified as Adam Fox[9] asked, "Hypothetically if we had to storm the Capitol and charge politicians and the Governor with their crimes, who would honestly commit to this??"  U.S. Suppl. Resp. Ex. 1 at 1.  Krol responded: "That particular issue: ME… the reason I state that particular issue, I'm willing to kill or die for Liberty.  24–25 years ago, I had a militia leader ask me to gun fight the police over a dilapidated boat the [*sic*] was owned by his estranged daughter and court ordered to allow them access to his property over it… I refused that request!"  U.S. Suppl. Resp. Ex. 1 at 2. Fox replied, "Everything said on here is hypothetical but it's time to move past the rally's [*sic*] and pointless bullshit that doesn't work."  *Id.*  Krol then wrote that he "spoke on the Michigan Capital [*sic*]

---

[9] Adam Fox was convicted in August 2022 by a federal jury of conspiracy to kidnap Governor Whitmer and conspiracy to use weapons of mass destruction against persons or property.  *See* U.S. Suppl. Resp. at 1 (citing *United States v. Fox*, No. 20-cr-00183 (W.D. Mich. Aug. 23, 2022)); *Remaining Defendants Convicted in Conspiracy to Kidnap Michigan Governor Gretchen Whitmer*, U.S. Dep't of Justice (Aug. 23, 2022), https://www.justice.gov/usao-wdmi/pr/2022_0823_Fox_et_al.

steps last fall that I would rather apprehend Tyrants at the Capital [*sic*], hang them on those beautiful oak trees then kill citizens in a civil war…. just saying." *Id.*

In April 2020, an individual named Joe Morrison[10] sent a Facebook message to Krol, asking, "[W]hat are the guidelines for the rally armed??"  U.S. Suppl. Resp. Ex. 2 at 1, ECF No. 27-2.  Krol then replied, "Michigan law… Open carry and concealed if you have a permit or want to just take that chance. . . . NO RESTRICTIONS ON OUR PART!"  *Id.*  Krol subsequently sent pictures of himself dressed in tactical gear and carrying weaponry to Morrison. *Id.* at 2–4.  He also sent Morrison a picture showing an individual, whom Krol identified in a later message as himself, who appeared to be open carrying a handgun and to have been detained by a law enforcement officer.  *Id.* at 6.  In another Facebook group chat dating from April 2020 that included Morrison, Krol referred to Governor Whitmer as "Whitmer the Hunn [*sic*]."  U.S. Suppl. Resp. Ex. 3 at 1, ECF No. 27-3.

In another Facebook post, Krol wrote: "Looks like a BOOGALOO PARTY… love their attire! . . . Me thinks [*sic*] we need a BOOGALOO DRESS UP PARTY in Lansing once the weather breaks!  Bring some grills and beverages (soft because of where) and lot of GUNS!  Every one [*sic*] would be required to wear boogaloo vibe clothing."[11]  U.S. Suppl. Resp. Ex. 2 at

---

[10] Joseph Morrison has been convicted, in connection with the plot to kidnap Governor Whitmer, of gang membership, providing material support for terrorist acts, and carrying or possessing a firearm during the commission of a felony.  Press Release, Mich. Dep't of Att'y Gen., *Members of Wolverine Watchmen Convicted on All Charges* (Oct. 26, 2022), https://www.michigan.gov/ag/news/press-releases/2022/10/26/members-of-wolverine-watchmen-convicted-on-all-charges.

[11] According to the Southern Poverty Law Center, "[t]he thread that binds boogaloo adherents is their belief that the country is headed toward a civil war—and that mass civil conflict of this kind is the only way for the country to right its path. . . . All boogaloo adherents share antigovernment beliefs and hold especially deep animus for members of law enforcement. . . . Boogaloo adherents support civil war and revolution against the current democratic system— something they often discuss sparking by forcing violent confrontations with members of law enforcement."  Southern Poverty Law Center, *Who Are Boogaloos, Who Were Visible at the*

11.  Morrison also sent a Facebook message to Krol in January 2020, in which Morrison wrote, "So boogaloo party is when we bring the tar and feather??" *Id.* at 9.

The Government rightly emphasizes Krol's statement about "apprehend[ing]" and "hang[ing]" politicians from oak trees.  This is a plainly grotesque statement.  In his response, Krol argues that the statement was "nothing more than a hyperbolic hypothetical answer to an imaginary event."  Def.'s Reply to U.S. Suppl. Resp. at 3, ECF No. 28; *see also* Def.'s Mots. Ex. Q (FBI Interview, Part 1) at 33:12 (saying in FBI interview that his statement was "hypothetical").  But Krol's statement, hyperbolic or hypothetical or not, is informative of his potential willingness to inflict violence himself or encourage others to inflict violence on perceived political enemies.  It suggests that, contrary to Krol's insistence otherwise, his alleged actions on January 6 may not be anomalous, but may instead be consistent with extremist views about using violence to achieve political aims.[12]  *See* Def.'s Mots. at 30.

Krol also objects to the Government's portrayal of his association with Adam Fox and Joseph Morrison, stating that, "while he may have met them in passing at a peaceful protest, he has no personal relationship with either Adam Fox or Joe Morrison."  Def.'s Reply to U.S. Suppl. Resp. at 2.  But according to Krol himself, he has had a personal relationship with two *additional* individuals alleged to have been involved with the plot to kidnap Governor Whitmer,

---

*Capitol and Later Rallies?* (Jan. 27, 2021), https://www.splcenter.org/hatewatch/2021/01/27/who-are-boogaloos-who-were-visible-capitol-and-later-rallies.

[12] Krol's language about hanging politicians from trees is also reminiscent of the violent imagery of the gallows erected in front of the Capitol on January 6.  Catie Edmonson, *"So the Traitors Know the Stakes": The Meaning of the Jan. 6 Gallows*, N.Y. Times (June 16, 2022), https://www.nytimes.com/2022/06/16/us/politics/jan-6-gallows.html.  That "imagery [of the gallows], said experts who study domestic extremism, evokes the early practice of hanging traitors; the nation's dark history of lynchings and violent attempts to terrorize Black Americans; and a novel favored by white supremacists that culminates in the mass hangings of political enemies."  *Id.*

*see* Def.'s Mots. Ex. Q (FBI Interview, Part 1) at 17:37–17:44, 19:42–19:49: William and

Michael Null, who have been charged, in connection with that plot, with providing material

support for terrorist acts and carrying or possessing a firearm during the commission of a felony,

*AG Nessel Charges 7 Under Michigan's Anti-Terrorism Act as Part of Massive Joint Law*

*Enforcement Investigation*, State of Michigan Attorney General Dana Nessel (Oct. 8, 2020),

https://content.govdelivery.com/accounts/MIAG/bulletins/2a4e649.  During Krol's interview

with the FBI, he—despite indicating that he was aware that the Null brothers had been charged

in the plot to kidnap Governor Whitmer, *see* Def.'s Mots. Ex. Q (FBI Interview, Part 1) at 17:48

(asking why the Null brothers had not yet been to court)—attested to the Null brothers'

characters, stating: "They're good guys.  I'd trust them with my kids and my grandkids," *id.* at

19:53–19:55.  The Court understands, and notes with particular concern given its purposes here,

that a Michigan court has lifted the house arrest and curfew restriction for the Null brothers,

though they remain on electronic monitoring.  Frank Whitsil, *2 Whitmer Plot Suspects, Twin*

*Brothers, Released from House Arrest, but Must Wear Tethers*, Detroit Free Press (Apr. 14,

2021), https://www.freep.com/story/news/local/michigan/2021/04/14/michael-null-william-null-

whitmer-kidnapping-suspects-house-arrest/7222609002/.  Even if Krol did not himself

participate in the plot to kidnap Governor Whitmer, his associations with these individuals raise

alarms for the Court, given that Krol has also made statements demonstrating hostile feelings

toward the governor.  *See* U.S. Suppl. Resp. Ex. 3 at 1; Def.'s Mots. Ex. R at 2.

  Krol's statements against his perceived political enemies are especially disquieting when

the Court considers Krol's historical participation in a militia group and his cache of guns.

During his interview with the FBI, Krol stated that, while he was once second in command and

spokesperson for Genesee County Volunteer Militia, he had not been involved with the group for

approximately three years.  Def.'s Mots. Ex. Q (FBI Interview, Part 1) at 25:57–26:53.  But Krol

indicated that he would have remained with the militia if not for an internal disagreement.  *See*

*id.* at 26:42–26:52.  In addition, when confronted with his chat exchange with Adam Fox during

the FBI interview, Krol asked the FBI agent, "I took an oath.  Did you?"  *Id.* at 34:58.  Krol then

asked further, "Foreign and domestic, right?  So what is, what is an enemy of the state?"  *Id.* at

35:16–35:22.  Later, Krol also said: "Because tyranny, listen, I don't care who you are, I don't

care what you want to tell me, but that same thing that's happening in Canada is nigh and high

on our doorsteps today.  So where's your oath?  You gonna let it happen?"  *Id.* at 36:20–36:37.

Whether Krol remains involved in an organized militia or not, he continues to believe that he has

taken an oath to protect the United States from those whom he perceives to be enemies of the

state and to prevent any perceived "tyranny" from taking hold in the United States.  *See also*

Def.'s Mots. Ex. R at 3 ("KROL's tattoos resemble his firm beliefs and patriotism.  They include

cattle brand logos on his upper left shoulder referencing the Bundy brothers' victory over

oppression and Robert LaVoy Finnicum [*sic*], who [was] killed in the occupation of the Malheur

National Wildlife Refuge.").  That is all the more concerning when Krol "has a concealed carry

license" and owns a cache of "approximately ten guns," providing him the means to act on his

evinced willingness to harm his perceived political enemies.  Def.'s Mots. at 27.

    In sum, this final factor in assessing dangerousness weighs strongly in favor of detention.

"Because this factor substantially overlaps with the ultimate question whether any conditions of

release 'will reasonably assure . . . the safety of any other person and the community,' it bears

heavily on the Court's analysis."  *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *5

(D.D.C. Mar. 10, 2021) (quoting 18 U.S.C. § 3142(e)).

Based on its consideration of the above factors, the Court agrees with Magistrate Judge Ivy in concluding that Krol should be detained. *See* U.S. Mem. Opp'n Ex. 2 at 6. The Court finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community" should Krol be released pending trial. 18 U.S.C. § 3142(e). The Court thus denies Krol's motion to revoke his detention order.

### C.  Reopening Detention Hearing

For the same reasons that Krol offers for revoking his detention order, he also requests that his detention hearing be reopened. For the Court to reopen the detention hearing, it must find that Krol has offered information "that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2).

Krol argues in support of both of his motions that the Central Virginia Regional Jail's bar to inmates' access to electronic devices has hampered his ability to lend reasonable assistance to counsel in preparation of his case. Because this argument does not fit neatly under any of the factors relevant to the Court's considerations as to the detention order, the Court instead analyzes this argument here and finds that Krol's lack of access to electronic devices does not suffice to either revoke the detention order or reopen the detention hearing. The restrictions imposed by the jail constitute information not known to Krol at the time of his detention hearing, but they do not have material bearing on the Court's assessment above of whether there are conditions of release that would reasonably assure the safety of the community.

Though defense counsel does not specifically cite to this authority, the Court also considers the possibility of temporary release under 18 U.S.C. § 3142(i), which provides that a "judicial officer may, by subsequent order, permit the temporary release of the person . . . to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." *Id.* This section "provides a distinct mechanism for temporarily releasing a detained defendant, in a manner that has nothing to do with a revisiting of the initial detention determination." *United States v. Worrell*, No. 21-cr-292, 2021 WL 2366934, at *9 (D.D.C. June 9, 2021) (quoting *United States v. Lee*, No. 19-cr-298, 2020 WL 1541049, at *3 (D.D.C. Mar. 30, 2020)). As the Sixth Circuit has observed, there is "limited authority governing what conditions require release for defense preparation." *United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020). "Courts considering whether pretrial release is 'necessary' under § 3142(i) have considered: (1) the time and opportunity the defendant had to prepare for the trial and participate in his defense, (2) the complexity of the case and volume of information, and (3) the expense and inconvenience associated with preparing while incarcerated." *Id.* "Regardless of the basis for a § 3142(i) motion, the defendant bears the burden of demonstrating that his temporary release is warranted." *United States v. Thomas*, 456 F. Supp. 3d 69, 72 (D.D.C. 2020).

In this case, Krol has had several months to participate in his defense and a trial date has yet to be set. His defense counsel has had access to the electronic discovery in this case and has visited Krol at the jail on several occasions. Def.'s Mots. at 9. Although Krol himself may not be allowed access to electronic devices, his defense counsel has not averred that counsel is barred from bringing electronics into the jail to show Krol the relevant video evidence. The limitation on Krol's access, while inconvenient, does not lead the Court to conclude that release

would be *necessary* for Krol to participate in his defense.  *See United States v. Diaz Guillen*, No. 18-cr-80160, 2022 WL 4119741, at *1, *5 (S.D. Fla. Sept. 9, 2022) (denying temporary release despite difficulties with reviewing discovery due to conditions and quarantine process due to COVID-19); *United States v. Persico*, No. S 84 CR 809, 1986 WL 3793, at *2 (S.D.N.Y. Mar. 27, 1986) (denying temporary release because defendant "has had ample time to prepare his defense, even given the practical limitations on his access to telephones and the Attorney Conference Room").  Further, during its October 6 hearing, the Court asked that the Government inquire whether the Central Virginia Regional Jail might be able to better facilitate Krol's access to evidence as needed.  Until the Government reports that the jail cannot make any such accommodations, and defense counsel has demonstrated with sufficient specificity that other means of providing Krol access to relevant evidence are wholly inadequate or that any such problems cannot be remedied with a transfer of facility, the Court will decline to release Krol under 18 U.S.C. § 3142(i).  *See United States v. Jeffries*, No. 10-cr-100, 2011 WL 182867, at *4 (E.D. Tenn. Jan. 20, 2011).

Absent the submission of medical records demonstrating the alleged deterioration of Krol's health since his hearing before Magistrate Judge Ivy, Krol offers only letters of support and claims about his disaster relief efforts and work to provide Flint, Michigan residents with bottled water.  This is not "new and material information" showing "truly changed circumstances, something unexpected, or a significant event."  *Caldwell*, 2022 WL 168343, at *6 (quoting *Lee*, 451 F. Supp. 3d at 5).  Thus, the Court will deny Krol's motion to reopen the detention hearing.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motions (ECF Nos. 24, 25) are **DENIED**.  Should Krol submit to the Court medical records evincing a formal diagnosis of his purported medical conditions, Krol may refile his motion to reopen the detention hearing for the Court's consideration.

**SO ORDERED**.

Dated:  November 15, 2022                                    RUDOLPH CONTRERAS
                                                            United States District Judge